Moncure P.
delivered the opinion of the court.
On the 19th of November 1835, A. B. Sprinkle, of *387 the county of Smyth, Virginia, intermarried with Phoebe Hayworth, of the county of Greene, Tennessee. They lived together in great happiness during their whole married life, which lasted about thirty-five years, the whole of which was spent in the county of Smyth, and nearly all of it in the town of Marion, in that county. By their joint industry, frugality and economy, they amassed quite a large fortune: and never having had any children, it was their wish and intention, often expressed, that whatever of their property might be left unexpended and undisposed of at the death of the survivor of them, should be divided into moieties, one of which should go to the family or collateral heirs of the husband, and the other to the family or collateral heirs of the wife. The husband died on the 19th day of January 1870. The wife survived him, but only a day or two, having died on the 21st of January 1870. She appears to have been in usual health at the time of his death; but was so shocked at that event, she almost at once became wholly paralyzed, and remained so, and generally unconscious, until her death. They were buried in the same grave. He left a will, which bears date on the 29th day of January 1869, and was duly admitted to probate in the County court of Smyth county on the 28th day of March 1870. The will contains three items. The first provides for the payment of his debts, if any. The second and third are in these words:
“Item 2d. I will and bequeath to my beloved wife, Phoebe, all my estate of which I may die possessed, both real and personal, of every description whatsoever, she having aided me in making all that I have. My desire is, that she shall own absolutely everything that I may die possessed of.
“Lastly. As my wife is hereby made my heir and *388 sole devisee, I hereby constitute and appoint her the executrix of this my last will and testament, and desire that she shall not be required to give any official bond.”
The wife died without leaving a will, not having been in a condition to make one in the short interval between his death and hers.
On the 20th day of April 1870, John T. Sprinkle and others, heirs at law and next of. kin of the husband A. 13. Sprinkle, brought this suit in the Circuit court of Smyth county, against Nathaniel Hayworth and others, heirs at law and next of kin of the wife Phoebe Sprinkle, for the purpose of setting up and enforcing an alleged parol understanding and agreement between the said husband and wife, for the equal division of the estate of the husband, left at the death of the wife, between their two families as aforesaid. In their bill the plaintiffs set out the particulars of their claim.
Some of the defendants filed their answers to the bill; in which they denied that there was any such understanding and agreement between said Sprinkle and wife in regard to the disposition of the property owned by said Sprinkle, as was claimed in the bill; and the said defendants claimed that they and the other heirs at law and next of kin of the said wife held and were entitled to hold the said property as such heirs at law and next of kin.
Sundry depositions were taken in the suit on both sides; and on the 4th day of March 1874 the cause came on to be heard upon the bill of complainants, the demurrer (which had been filed), and answer of N. Hayworth and others, the replication thereto, the exhibits filed, and the depositions of witnesses; and was argued by counsel. On consideration whereof, the *389 court overruled the demurrer; and proceeding to decide the cause on its merits, decreed that the plaintiffs were not entitled to recover anything by reason of the matters set forth in their bill, and would then have dismissed the bill; but it appearing that the property had been rented out under the order of court, and that the transaction on that account remained unsettled, the cause was retained for the purpose of such settlement.
The plaintiffs applied to a judge of this court for an appeal and supersedeas to the said decree; which were accordingly allowed and awarded. And that is the case which we now have to dispose of.
There never was a will more plainly written, or one on the face of which there was less room for doubt or difficulty in the construction of it, than the one we now have before us. The language of the second clause, as before stated, is: “I will and bequeath to my beloved wife Phoebe all my estate, of which I may die possessed, both real and personal, of every description whatsoever, she having aided me in making all that I have. My desire and will is, that she shall own, absolutely, everything that I may die possessed of.” Could language be more comprehensive or emphatic to invest the wife with the largest possible interest in, and power over, the estate of the husband ? But to make it still more plain, if possible, the testator proceeds in the last clause to say: “As my wife is hereby made my heir and sole devisee, I hereby constitute and appoint her the executrix of this my last will and testament, and desire that she shall not be required to give any official bond.”
And yet, plain as is this written will, the plaintiffs contend that it ought not to be carried into effect as it is written; that there was a parol understanding and *390 agreement between tbe husband and wife, in virtue of which the plaintiffs, his heirs at law and next of kin, are entitled to one moiety of the estate left at her death.
There could be no valid and binding agreement between husband and wife, as she was not a competent contracting party. Suppose there was in fact such an understanding between them as the plaintiffs contend for, could effect be given to it, contrary to the plain and express language of the written will ?
To give it such effect, would seem to be clearly inadmissible for several reasons: First, because by the common law it is a general rule that a written instrument cannot be varied or contradicted by parol evidence ; and there is nothing in this case to make it an exception to the general rule. Secondly, because such an effect would be contrary to the spirit and true intent and meaning of the statute of frauds. Code, p. 985, eh. 140, section 1. And thirdly, because it would be contrary to the statute of wills. Code, p. 887, ch. 112, section 1; Id., p. 910, ch. 118, section 4, which declares, that “no will shall be valid unless it be in writing, and signed by the testator, or some other person in his presence and by his direction, in such manner as to make it manifest that the name is intended as a signature; and moreover, unless it be wholly written by the testator, the signature shall be made, or the will acknowledged, by him in the presence of at least two competent witnesses, present at the same time; and such witnesses shall subscribe the will in the presence of the testator; but no form of attestation shall be necessary.”—And section 8, which declares, that “ Ho will or codicil, or any part thereof, shall be revoked, unless under the preceding section (in regard to revocation by marriage,) or by a subsequent will or *391 codicil, or by some writing declaring an intention to revoke the same, and executed in the manner in which a will is required to be executed; or by the testator, or some person in his presence and by his direction, cutting, tearing, burning, obliterating, canceling or destroying the same, or the signature thereto, with the intent to revoke.” It would be strange if, after all this care taken by the legislature to prevent fraud in the making and revocation of wills, a will, solemnly made, in strict and literal pursuance of all the requisitions of the statute, could be annulled and destroyed by loose declarations of the testator, testified to chiefly by interested parties.
A great deal was said in the argument about the omission in our statute of the seventh section of the English statute jof frauds, which declares, that all declarations or creations of trust and confidence of any lands, &e., shall be manifested and proved by some writing signed by the party, &c.; and it was argued that, while under the English statute, such a trust as is attempted to be set up in this case would be invalid, it is valid in this state for the reason aforesaid.
Certainly a resulting trust is not even within the English statute of frauds, and, of course, is not within ours. Indeed, the__ eighth section of. the English statute, which is also omitted in ours, expressly excludes resulting trusts from the operation of the statute. The case of the Bank of the United States v. Carrington &c., 7 Leigh 566, referred to in the argument, was a ease of resulting trust. There are other trusts not strictly coming under the denomination of resulting trusts, which are not within the statute. Tucker, P. enumerates many of them in his opinion in the case just cited; and in 1 Lomax’s Dig., top page 288, all these trusts are considered under the denomi *392 nation of “implied, resulting and constructive trusts.” Eor peculiar reasons they are excluded from the operation of the statute.
But without attempting to define these several trusts, or to give the reason why they are not embraced within the statute of frauds, or to state the effect, if a.ny, of the omission in our statute of the 7th section of the English statute of frauds, we think we can safely say that under our statute of frauds, if there were no other statute or law to prevent it, such a parol understanding or agreement as is set up in the bill, however well proyed it may have been, would be insufficient to contradict or invalidate a will so plainly written as the will in this case. It could not have that effect as a parol declaration or creation of trust, for to give it that effect would be to subvert the statute. The most solemn wills and deeds could then be annulled by loose parol declarations under the name of trust. The danger of admitting such declarations, for such a purpose, was demonstrated in Cox, &c., v. Cox, decided by this court a few days ago. Even in the case of a resulting trust the proofs ought to be very clear if the trust does not arise on the face of the deed itself. Opinion of Brockenbrough, J., in the Bank of U. S. v. Carrington, &c., 7 Leigh 576, and the cases cited by him. We do not mean to admit, however, that there is any difference in effect between the English statute of frauds and ours arising from the omission in the latter of the seventh and eighth sections of the former. That is a question which is unnecessary, and not intended to be discussed in this case.
However that may be, we think the statute of wills, as before shown, plainly forbids that a parol will, whether in the form of a trust or otherwise, shall be set up and established, especially when there is a written *393 will to the contrary which has been executed and established in strict pursuance of the statute.
To be sure fraud may have the effect of setting aside a deed or will, or converting a grantee or devisee into a trustee for the benefit of others. “The fraud which suffices to lay a foundation for such a trust is not simply that fraud which is involved in every deliberate breach of contract. The true rule seems to be that there must have been an original misrepresentation, by means of which the legal title was obtained; an original intention to circumvent, and get a better bargain by the confidence reposed. Thus, as has been held in many cases, if a man procure a certain devise to be made to himself by representing to the testator that he will see it applied to the trust purposes contemplated by the latter, he will be held a trustee for those purposes.” Brown on the Statute of Frauds, § 94. See also Gilbert's Forum Romanum, p. 328, 329. There is a very recent case of the very highest authority, in the English books, which was referred to in the argument of this case by the counsel for the appellees, and which very strongly illustrates the law on the branch of the subject we are now considering. We mean McCormick v. Grogan, decided by the House of Lords in 1869, and reported in the law reports, English and Irish Appeal Cases, vol. 4, p. 82. The court of appeal in Ireland had reversed a decretal order of the Lord Chancellor there, and the House of Lords affirmed the decision of the court of appeal. It does not appear that there was any dissent to that decision of the House of Lords. Lord Chancellor Hatherley and Lord Westbury delivered seriatim opinions in the case, and Lord Cairns expressed his entire concurrence in their ■opinions. We will have occasion to refer to that case *394 again. We will now notice only so much of it as relates to the branch of the subject we are now consideringLord Chancellor Hatherley, after stating several caseg in which a devisee had been held to be a trustee upon parol proof of a fraud committed by him in procuring the devise, thus proceeds: “But this doctrine evidently requires to be carefully restricted within proper limits. It is in itself a doctrine which involves a wide departure from the policy which induced the legislature to pass the statute of frauds, and it is only in clear cases of fraud that this doctrine has been applied—cases in which the court has been persuaded that there has been a fraudulent inducement held out by the apparent beneficiary, in order to lead the testator to confide to him the duty which he so undertook to perform.” And Lord Westbury said: “The jurisdiction which is invoked here by the appellant is founded altogether on personal fraud. It is a jurisdiction by which a court of equity, proceeding on the ground of fraud, converts the party who has committed it into a trustee for the party who is injured by that fraud. How being a jurisdiction founded on personal fraud, it is incumbent on the court to see that a. fraud, a malus animus is proved by the clearest- and most indisputable evidence.” Much more was said by his lordship which bears upon the subject under-consideration, but for the present we will quote no more from the ease.
In this case, certainly, then, there is not a particle of proof, nor is it pretended that there was any fraud on the part of the devisee to induce the devise; nor that she would not, if she had lived long enough, have made such a disposition of the property as is now claimed by the appellants; not in discharge of an obligation which could be enforced in a court of *395 law or equity, but as a voluntary act, in pursuance of what she no doubt believed were the wishes of her husband.
We are therefore of opinion that the parol evidence in this case was inadmissible to alter or contradict the will, or set up a trust under the same.
We are also of opinion, that even if the evidence were admissible, it would be insufficient to prove such a trust as is claimed in this cause. The will itself certainly shows the intention of the testator more plainly than the parol declarations made by the testator and his wife, testified to, as they chiefly are, by interested parties. The will, as we have seen, is very plainly expressed, as if the testator was careful to exclude the idea that his wife should be considered as holding the property for the benefit, ultimately, of the heirs of the two families respectively, according to the claim set up in this suit, and not for her own exclusive and absolute use. If really the testator had intended to give those two families, or either of them, any interest in remainder in his estate, he would have done so expressly in his will. He would, for example, have given a moiety of his estate to his wife absolutely, and the other moiety to her for life, with remainder to his own right heirs and next of kin. That he did not plainly do so, which he could so easily have done, is strong, if not conclusive evidence to show that he did not intend to do so. He was not taken by surprise by death. His will was well and carefully prepared, obviously by a lawyer, more than a year before his death, and is, in substance, the same with a will which he executed seventeen or eighteen years before. It was his deliberate and cherished purpose to make it as he did,- and he meant what he said, whatever may have been his wishes in regard to the distribution of any of the' *396 property which might remain unexpended or undisposed of at her death. Those wishes were altogether subordinate to his main intention to leave all his estate of which he might die possessed, both real and personal, of every description whatsoever, to his wife; and that she should own absolutely everything that he might die possessed of. Though sometimes advised to name in his will his wishes in regard to the ultimate distribution of the property which might be left at his wife’s death, he carefully avoided doing so, lest his wife might thereby be restrained in some degree in the use and enjoyment of the property. If he had survived her, the property would certainly have been his absolutely, to dispose of as he pleased, and he could not have been restrained in such disposition by his heirs at law or those of his wife, upon the ground of any trust in their favor, arising from the loose conversations between him and his wife, or otherwise. As she survived him, he intended to leave her in his place, and to give her the property and all power over it to the same absolute extent as he would have held and enjoyed it had he been the survivor. He did not know how long she would live, nor what occasion she might have for the use of the property after his death; and therefore he gave it to her absolutely. He had perfect confidence in her, and was willing to give it to her absolutely, trusting and believing that she would do what was right when she came to dispose of what property might remain undisposed of at her death. George W. Jones, a witness for the plaintiff's, says, that it was the understanding between A. B. Sprinkle and wife, “that whichever outlived the other was to have the benefit of the whole property during their life; and then the property was to be divided, whatever may ■he left, equally between his family and the family of *397 his wife.” "Wade D. Strother, another witness for the plaintiffs, says: “I suggested to him the propriety of putting this specific arrangement (for the ultimate division of the property between the two families) beyond any contingency. He replied that he did not desire to do so, as he had the fullest confidence in Mrs. Sprinkle; that as soon as he was laid away, and it was proper to do so, she would make a will that would carry out certainly this agreement; furthermore, that he desired it to be in her power to use as much of his property as would be necessary to her comfort, should she be afflicted” This witness is a lawyer, had written the testator’s will, and he would no doubt have been called on to write the declaration of trust, if the testator had taken his advice and been willing to 'make one; but he was not, obviously for the reasons above stated. Mrs. Strother, another witness for the plaintiffs, says: “ I heard Mr. Sprinkle say once that he had perfect confidence in his wife, that she would carry out their agreement; that he did not want to tie his property up. My impression was, that he did not want to leave his property to his wife for life and then to others, so that she would feel that any one else had any claim to it. Me said, that in so many words. He said he had perfect confidence in his wife, that if she survived him, she would make a will and divide the property according to their agreement; that he would give it to her absolutely with that agreement.”
How if the testator intended to give his wife the right to dispose of the property, or any part of it at her pleasure, to her own use, he gave her the absolute estate; and even if he had engrafted on the will an express limitation over of the property which might remain undisposed of at her death, the absolute devise would have been good, and the limitation over repug *398 nant thereto and void. A fortiori, a parol limitation over of such residue, directly contrary to such an absolute devise on the face of the will as exists in this case, would be void, even supposing that a parol limitation could be engrafted on a will in any case, except in a case of fraud as before mentioned.
That the testator did intend to give his wife the right to dispose of the property at her pleasure during her life, is, we think, perfectly certain, even according to the parol evidence itself.
We will refer to two cases only on this last branch of the case, both of which were referred to in the argument of the case, one an English and the other a Virginia case, although many other cases might be cited to the same effect. The English case is the one from which we have already quoted so largely in another branch of this case. McCormick v. Grogan, supra. There, as here, the will was absolute in form. But there the testator gave his instructions to his devisee and legatee, not by parol declarations, but in a letter addressed to the latter. The marginal abstract of the case is as follows : “ C. made a will, leaving his whole property, real and personal, to Gr., whom he also appointed his executor. When about to die, C. sent for GS-., and in a private interview told him of the will, and on Gr.’s asking whether that was right, said he would not have it otherwise. C. then told G. where the will was to be found, and that with it would be found a letter. This was all that was known to have passed between the parties. The letter named a great many persons, to whom C. wished sums of money to be given, and annuities to be paid; but it contained several expressions as to G. carrying into effect the intentions of the testator as he might think best;” and this sentence: “‘I do not wish you to act strictly on the *399 foregoing instructions, but leave it entirely to your own .good judgment, to do as you think I would if living, and as the parties are deserving, and as it is not my wish that' you should say anything about this document, there cannot be any fault found with you by any of the parties, should you not act in strict accordance with it.’ G. paid money to some of the persons mentioned in the letter, but not to all: Held, that in this case there was not any trust created binding on G.” Lord Chancellor Hatherley in his opinion said: “ The instructions on their very face appear to bear this interpretation, that it was the testator’s intention to leave Mr. Grogar sole and complete master of his property. How, ip the first place, what other theory is there that can give any accouut of his taking this singular mode of disposing of his property, except that he did not intend the instructions to have legal effect? There was no charitable trust concealed, nor any other trust of any sort which the testator was desirous of keeping back, because either the trust might be illegal or he might have doubts of its legality. There was no question of perpetuity, or anything else which could render it in any way more desirable for him, instead of effecting his intentions in a proper and legal manner, by expressing them in a regular instrument, to do it in this strange and circuitous mode of giving the whole property to one man, and leaving an instrument utterly inoperative in law for carrying his intentions into effect.”
How, for the very same reason, we may enquire in this case, why the testator did not expressly limit his wife’s estate to her life, and give it in remainder to his heirs and her heirs in equal moieties, if he had so intended? Why did he give the estate to her absolutely, and carefully abstain from making any allusion *400 to any of those heirs in his will, though advised by his. counsel to do so? There is, in truth, but one reasonable answer; and that is, he intendéd what he said in his will.
There are expressions of a like kind in the opinion of Lord Westbury, but it is unnecessary to quote them.
The Virginia case to which I refer is that of May v. Joynes ¿-c., 20 Gratt. 692, decided by this court in 1857, but not reported until 1871. The following is the marginal abstract of the case by the reporter: “ Testator says, I give to my beloved and excellent wife, subject to the provisions hereafter declared, my whole' estate, real and personal, and especially all real estate which I may hereafter acquire, to have during her life, but with full power to make sale of any part of the said estate, and to convey absolute title to the purchasers, and use the purchase money for investment, or any purpose that she pleases, with only this restriction, that whatever remains at her death shall, after paying any debts she may owe, or any legacies she may leave, be divided as follows: There are then limitations to-his children and grandchildren—Held: The wife takes a fee simple in the real, and an absolute property in the personal, estate; and the limitation over, of whatever remains at her death, is inconsistent with, and repugnant to, such fee simple, and absolute property in said real and personal estate, and fails for uncertainty.” Allen, P. delivered the opinion of the court, in which all the other judges, but Samuels, J. concurred. The case was very ably argued by distinguished counsel, and their arguments are fully reported. They refer to all the material authorities bearing on the interesting question involved in the case, which was, whether a remainder over, limited on an express estate for life, was rendered invalid by a power of disposition given *401 to the tenant for life for her own use over the principal of the estate, or any part of it.
We think that case was a much stronger one in favor of the limitation over than this ease is, for there . the estate, on which the limitation depended, was an express estate for life, while here it is a fee simple and absolute estate. There, the limitation over was expressed in the will. Here, there is no allusion whatever to it in the will. If the limitation over in that case was repugnant to the estate given to the wife, a fortiori, the limitation over in this case was repugnant to the estate given to the wife.
If the testator had foreseen the death of his wife so soon after his own death, without having time or opportunity, or being in a condition to make a will, or had thought of such a contingency as likely to take place, be would no doubt have provided for it by his will, and disposed of the property among the heirs of both parties, according to what he knew to be the wishes of both in such an event. But he made no such provision, and whatever may have been the cause of the omission, this court cannot supply it. To do so would be to make a will for the testator, and not to construe and give effect to the will as made by himself. The latter is our only legitimate office. The former is beyond our power.
In every view of the case, therefore, we are of opinion that there is no error in the decree appealed from, and that it ought to be affirmed.
Staples, J.
I understand the president’s opinion as holding that in order to establish the trust, it is necessary to show a fraudulent intent on the part of the devisee or legatee in obtaining the will. I am not prepared to concur in that view.
*402 If, for example (in the familiar instance), the testator communicates his intention to the devisee of charging a legacy on his estate, and the devisee should tell him it is unnecessary, and he will pay it, the legacy being thus prevented, the devisee will be required to make it good. In such case it does not matter whether the devisee made the representation fraudulently or not. The fraud is in the refusal to pay the legacy; not in the promise, but in the breach.
I concur fully in the rest of the opinion.
Decree arrirmed.